IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

LAURA GUTIERREZ,

      Plaintiff,

vs.                                                                               Civil No. 05-0017 RLP

JO ANNE B. BARNHART,
Commissioner of the
Social Security Administration,

      Defendant.

## MEMORANDUM OPINION AND ORDER
## DENYING PLAINTIFF'S MOTION TO REVERSE OR REMAND
## ADMINISTRATIVE AGENCY DECISION

Plaintiff, Laura Gutierrez, brings this action pursuant to 42 U.S.C. §405(g) seeking judicial review of the denial of her applications for disability income benefits and supplemental security benefits under Title II and Title XVI of the Social Security Act[1] by the Defendant, Commissioner of Social Security. Plaintiff contends that the Commissioner, through her Administrative Law Judge (ALJ herein) erred by: Substituting her opinion for that of Plaintiff's treating physicians; failing apply correct legal standards when evaluating Plaintiff's credibility and failing to support credibility findings with substantial evidence; failing to support findings related to Plaintiff's residual functional capacity with substantial evidence, and failing to include all of Plaintiff's impairments in the hypothetical question posed to a vocational expert.

---

[1]Plaintiff filed applications for Disability Income benefits (Title II) and Supplemental Security Income (Title XVI) on October 16, 2002. Her applications were denied at the first and second levels of administrative review. A hearing was conducted by an administrative law judge on November 17, 2003, and the decision denying Plaintiff's claims was entered on March 5, 2004. The Appeals Council declined review on November 17, 2004. The matter before the court is Plaintiff's motion to reverse or remand the administrative denial of her claim.

*Factual Background.*

Plaintiff was born on June 16, 1951. [Tr. 76]. The record reflects a discrepancy in her level of education.[2] Plaintiff twisted her left knee while working as a school custodian on April 12, 2001. (Tr. 77, 140). When examined approximately one week later, her knee was painful and swollen with a Baker's cyst behind the knee[3]. X-rays showed minimal tricompartmental arthritis. She was treated conservatively with medication, ace bandages and a knee brace. (Tr. 138-140). An MRI performed on April 30 demonstrated meniscal tears in two locations of the left knee as well as joint effusion with a large cyst. (Tr. 136-137).

Plaintiff was referred to Mark Nordyke, M.D., an orthopedic surgeon, who first examined her on May 29, 2001. She reported persistent pain with weight bearing in the left knee, swelling, difficulty with stairs, weakness and a popping sensation. Dr. Nordyke's physical examination documented numerous positive signs, including swelling, a Baker's cyst, tenderness to palpation, laxity of the anterior cruciate ligament and crepitus. Dr. Nordyke performed arthroscopic surgery on June 16, 2001, to clean out the torn menisci, and to tighten the ACL. (Tr. 158-159,163-164). By her second post operative visit on July 3, swelling had resolved. (Tr. 157). One month after surgery, Plaintiff complained of knee soreness. Dr. Nordyke recommended conditioning and aerobic exercise. He further stated:

---

[2]In a written report submitted on October 16, 2002, Plaintiff indicated that she had completed 12th grade. (Tr. 106). In her testimony before the ALJ, Plaintiff stated that she dropped out of high school in the 10th grade, and had not obtained a GED. (Tr. 36).

[3]"Baker's cysts (popliteal cysts) are tiny sacs filled with joint (synovial) fluid that form in an extension of the joint capsule behind the knee. A Baker's cyst results from an accumulation of trapped joint fluid, which bulges from the joint capsule behind the knee as a protruding sac. Causes of the joint fluid accumulation include rheumatoid arthritis, osteoarthritis, and overuse of the knees. Baker's cysts produce discomfort at the back of the knee." *www.merck.com/mmhe/sec05/ch074/ch074g.html*

She will likely continue to have a great deal of pain, and we (sic) will have difficulty negotiating stairs or kneeling and this will probably carry over into her work duty status. We will see the patient back in 3 weeks and try to get her back to a work duty status at that time.

(Tr. 156).

Plaintiff returned to Dr. Nordyke on October 6, 2001, with continued complaints of pain, swelling and tenderness. Dr. Nordyke recommended injections in order to calm the knee so that she could finish rehabilitation and return to work. (Tr. 156). Plaintiff had three Hyalgan[4]/steroid injections between August 28 and September 17, 2001. (Tr. 150-151, 154-155). Due to Plaintiff's continued complaints of pain, failure to respond to conservative measures and marked degenerative changes Dr. Nordyke ultimately recommended that she have total knee arthroplasty (replacement) to regain good function. (Tr. 149, 154).

On December 1, 2001, Plaintiff was seen by William Ritchie, M.D., an orthopedic surgeon, for a second opinion regarding the need for knee replacement. (Tr. 145-146). At the time of this visit, Plaintiff was taking no pain medication. Dr. Ritchie noted that Plaintiff had a significant limp on the left with some swelling and effusion, pain with full extension, lateral joint line tenderness, pain with patellar grind and tenderness along the lateral facet of the patella. X-ray studies demonstrated significant pathology.[5] Dr. Ritchie diagnosed symptomatic osteoarthritis of the left knee, and asymptomatic osteoarthritis of the right knee. He stated:

. . .(I)f her pain is significant enough and it is sufficiently interfering with her daily

---

[4]Hyalgan is indicated for the treatment of pain in osteoarthritis of the knee. *1999 Physicians' Desk Reference* at 2785.

[5]Degenerative changes in all 3 compartments of both knees, large marginal osteophytes particularly of the patello-femoral compartment and slightly greater in the right knee than in the left, significant narrowing of the lateral cartilage space in both knees with marginal osteophytes and subchondral sclerosis.

activities than (sic) a total knee arthroplasty will be a reasonable procedure to perform, as it should get rid of her pain, although her function might decline slightly with regards to knee flexion. She does have some obvious quadriceps and hamstring weakness on the left knee, and I feel that if she got it stronger her symptoms might improve somewhat, and she might be a candidate for some sort of water therapy or exercise in a pool to see if this will strengthen the upper knee and decrease her symptoms sufficiently to postpone her surgery. . . I do not feel . . .that with or without the surgery, she is going to be able to return to her duties as a custodian and she will have difficulty with squatting and heavy lifting with or without knee replacement.

(Tr. 146).

Plaintiff returned to Dr. Ritchie on May 9, 2002, stating that she was using an exercise bike. She continued to have a mild limp on the left, with trace effusion, mild pain when her knee was passively brought into full extension and mild diffuse joint line tenderness. Dr. Ritchie took new x-rays, and again diagnosed symptomatic osteoarthritis of the left knee, and asymptomatic osteoarthritis of the right knee. He gave Plaintiff a prescription for glucosamine, and stated that if she made progress in pool therapy further surgery would not been needed any time soon. He encouraged her to talk to the Department of Vocational Rehabilitation, because she would not be able to return to her former work duties. (Tr. 144).

Plaintiff attended aquatic therapy from May 20, 2002 to June 19, 2002. A progress report dated June 19 stated:

Pt now reports minimal to no pain during the day. She is able to participate in 40 minutes of aquatic exercise with no pain. Pt reports edema has decreased significantly, and none is noted during sessions. Pt is able to identify effective ways to address pain and edema at home.

(Tr. 143).

Plaintiff returned to Dr. Ritchie on July 1, 2002. (Tr. 142). On physical examination, she walked with a slow gait with a trace of left sided limp. Range of motion of both knees was

diminished, the left slightly more than the right[6], but both knees were stable.  The left knee demonstrated "a little bit of swelling" and "a little bit" of joint line tenderness.  Dr. Ritchie noted that Plaintiff had not pursued vocational rehabilitation, which he strongly encouraged her to do.  He advised her to continue pool therapy and exercises, and released her for modified duty with no walking or standing over 45 minutes per hour, no lifting over 40 pounds, limited squatting to less than 25% of the time, no ladder climbing over 3 feet.  He further stated that her pain complaints were not sufficient at that time to warrant knee replacement, but that she may need replacement in the future.

Plaintiff filed her applications for DIB and SSI on October 16, 2002.  (Tr. 77, 180).  In written materials submitted with her applications, she indicated that she continued to attend pool therapy three times a week, was unable to stand for long periods of time, at times had constant pain, could drive for short distances, did no household cleaning,  cooked only using a microwave,  didn't like to pick up anything heavy which might cause her to fall,  could walk for one block without stopping as long as her knee didn't lock up, fell when her knee locked up,  used a cane at times, had no problems with her hands, visited with family and friends, and was unable to sleep when in pain. Her current medications included Tylenol PM, "Move Free," Glucosamine, Chondroitin and various minerals.[7]  (Tr. 85-96).

The medical chart was evaluated by a non-examining agency physician, who on January 27, 2003, indicated that Plaintiff had the residual functional capacity (RFC herein) for  light work, with the additional limitations assigned by Dr. Ritchie ( occasional squatting, no ladder climbing over 3

---

[6]Normal range of motion of the knee is 0-140 degrees.  www.vba.va.gov/bln/21/Benefits/exams/ disexm34.htm  Range of motion of her knees was  5-125 degrees on the left and 0-125 degrees  on the right.

[7]Plaintiff also listed Darvocet prescribed by Dr. Nordyke.  She had not seen Dr. Nordyke for approximately one year as of this time.  It appears that the Darvocet was a post-operative medication.

feet, walking/standing limited to 45 minutes per hour).  In addition, the agency physician stated that Plaintiff's ability to  kneel, crouch crawl and climb stairs and ramps was limited to occasional, she could never climb ropes and scaffolds and that she should avoid concentrated exposure to cold and wet conditions and to vibration.  (Tr. 165-171).

On June 30, 2003, Dr. Ritchie submitted a form regarding Plaintiff's work status.  He indicated that her permanent work restrictions had not changed, that she could not squat, kneel or climb, but could perform moderate work, defined as "lifting 20 lbs. max. and frequently lifting and/or carrying of objects weighting up to 10 lbs.  May involve sitting w/a degree of pushing and pulling of arm or leg controls."  He also marked boxes indicating that Plaintiff should not climb, kneel or squat. (Tr. 178).  The form indicates that he had provided Plaintiff with a prescription for Naproxin.[8]  Two months later, Dr. Ritchie ordered three additional months of pool therapy.  (Tr. 179).

A summary of all physician-assessed physical limitations is attached to this Memorandum Opinion and Order as Addendum A.

At her hearing before the ALJ on  November 17, 2003, Plaintiff testified that knee pain prevented her from sleeping, that pain was now traveling to her back, that she had to prop her legs up most of the time due to pain, alternately using ice packs, heating pads and Mentholatum rubs, that her knees got so swollen they would rub against each other, that she continued to attend swim therapy which did help her knees, that is was impossible for her to walk, that she was able to drive herself to therapy, and that she hadn't looked for light duty work because her level of pain prevents her from working  (Tr. 33-36, 38-40).

---

[8]Naproxin in a nonsteroidal anti-inflammatory drug indicated for the treatment of, among other things, osteoarthritis and mild to moderate pain. *2005 Physicians' Desk Reference* at 2478.  Plaintiff testified she was not taking Naprosyn because her workers' compensation carrier had refused to pay it. (Tr. 38-39).

A Vocational Expert ("VE" herein) also testified at the hearing.  Her testimony is discussed *infra.*

### The ALJ's Decision

The ALJ found that Plaintiff had not engaged in substantial gainful activity since April 12, 2001, that she suffered the severe, medically determinable impairment of osteoarthritis of both knees, but that this impairment did not meet or equal the severity of a listed impairment.  The ALJ discounted Plaintiff's credibility regarding her complaints of pain, and found that she had the following RFC:

> I find that the claimant retains the following residual functional capacity: the ability to lift 20 pounds occasionally and lift 10 pounds frequently; she can stand or walk for up to 6 hours in an 8-hour day; there must be no prolonged periods of walking or standing, which exceeds (sic) 45 minutes; she can sit up to 6 hours in an 8-hour day with normal breaks; she can occasionally climb stairs, ramps, balance, crawl, or stoop; she should never squat, kneel, climb ropes, ladders or scaffolds; and she should avoid concentrated exposure to extreme cold, wetness, vibrations and hazards.

(Tr. 14).

Based upon the answer to a hypothetical question posed to a vocational expert which included the RFC outlined above as well as Plaintiff's age, limited education and past work experience, the ALJ determined that Plaintiff retained the ability to perform the jobs of production line assembler[9],

---

[9]DOT 706.684-022, light and unskilled; 16,000 in the regional economy, 2,000,000 in the national economy.  (Tr. 18, 46)

ornament hand maker[10], factory inspector[11] and eye glass assembler[12]. (Tr. 45-47, 18).

## Standard of Review

I review the Commissioner's decision "to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied." *Doyal v. Barnhart,* 331 F.3d at 760. (citation omitted). "Substantial evidence is such relevant evidence as a reasonable minds might accept as adequate to support a conclusion." *Id.* (quotations and citation omitted). However, "[a] decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there if a mere scintilla of evidence supporting it. *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988). The agency's failure to apply correct legal standards, or demonstrate that it has done so, is also grounds for reversal. *Winfrey v. Chater*, 92 F3d 1017, 1019 (10th Cir. 1996). Because judicial review is based on the record as a whole, I will meticulously examine the record in order to determine if the evidence supporting the Commissioner's decision is substantial, taking "into account whatever in the record fairly detracts from its weight." *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). However, I may not reweigh the evidence or substitute my discretion for that of the Commissioner. *Kelley v. Chater*, 62 F.3d 335, 337 (10th Cir. 1995).

## Analysis

### A.    Credibility evaluation

I find that the ALJ applied correct legal principles in evaluation of Plaintiff's credibility, and

---

[10]DOT 779.687-018, light and unskilled; 1,000 in the regional economy,5,000 in the national economy. (Tr. 18, 46).

[11]DOT 727.687-068, light and unskilled; 6,000 in the regional economy, 200,000 in the national economy.  (Tr. 18, 46-47).

[12]DOT 713.687-018, sedentary and unskilled; 2,000 in the regional economy and 200,000 in the national economy. (Tr. 18, 46).

supported his credibility finding with substantial evidence.

Credibility determinations are peculiarly the province of the finder of fact, and will not be upset when supported by substantial evidence. *Diaz v. Sec'y of Health & Hum. Serv.,* 898 F.2d 774, 777, *cited in Kepler v. Chater* 68 F.3d 387, 391 (10th Cir.1995). "However, '[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.'" *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988) (footnote omitted), cited in *Kepler, Id.* The ALJ must "articulate specific reasons for questioning the claimant's credibility" where subjective pain testimony is critical. *Kepler, Id.* (internal quotations omitted). When analyzing evidence of pain, the court does not require a formalistic factor-by-factor recitation of the evidence. If the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility, the ALJ will be deemed to have satisfied the requirements set forth in *Kepler. Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir.2000). Therefore, the mere fact that the ALJ did not conduct a formalistic factor-by-factor recitation of the evidence is not error so long as the ALJ has set forth the specific evidence he relied on in evaluating plaintiff's credibility.

In reviewing the medical record, the ALJ noted that Dr. Ritchie felt Plaintiff's pain symptoms could be lessened with water therapy, that Plaintiff participated in water therapy, and at the conclusion of three weeks of therapy she had "minimal to no pain during the day . . . (was) able to participate in 40 minutes of aquatic exercise with no pain . . .(and reported) edema (had) decreased significantly, and none (was) noted during sessions." (Tr. 16, 143). The ALJ also noted that after completing pool therapy, Dr. Richie felt Plaintiff could return to work, with certain physical limitations. (Tr. 16). This is substantial evidence which contradicts Plaintiff's testimony that she had constant pain and swelling.

### B.   Conflict in the Medical Evidence

Plaintiff contends that the ALJ impermissibly substituted his opinion for that of Plaintiff's physicians.    The record does not support this argument.

An ALJ may not substitute his lay opinion for medical opinion.  *See Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 744 (10th Cir.1993).   Plaintiff saw two treating orthopedic surgeons. In Dr. Nordyke's opinion, Plaintiff needed knee replacement surgery to regain good knee function.  (Tr. 154).  In Dr. Ritchie's opinion, Plaintiff's need for surgery could be avoided for some time through rehabilitation of her knee through aquatic therapy.  After Plaintiff completed three weeks of therapy, Dr. Ritchie  indicated that she could return to work with specified physical restrictions.  The ALJ relied upon Dr. Richie's opinion, which was consistent with the report of the aquatic therapist.

I find that the ALJ did not substitute his own opinion for that of Plaintiff's medical providers. Rather, he resolved a conflict  in the medical evidence, and he is permitted to do so.  *Eggleston v. Bowen*, 851 F.2d 1244, 1247 (10th Cir.1988).

### C.   Residual Functional Capacity and the Hypothetical Question Posed to the VE

The ALJ included the following limitations in the hypothetical question posed to the VE:

> I want you to assume that she can lift 20 pounds occasionally, 10 pounds frequently, can stand or walk up to six hours in an eight-hour day but should have no prolonged periods of walking or standing which exceeds 45 minutes.  I want you to assume that she can sit up to six hours a day with normal breaks.  She can occasionally climb ramps, balance, crawl, and stoop.  She should never squat, kneel, climb ropes, ladders, scaffolding, and other job (sic) which involves climbing stairs.  She should avoid concentrated exposure to extreme cold, wetness, vibration, or hazards.

(Tr. 45).

These limitations incorporate all the restrictions assigned by Dr. Ritchie and additional

restrictions assigned by the agency physician.  The opinions of Dr. Richie and the agency physician are substantial evidence which support the ALJ's RFC finding.

Finally, Plaintiff argues that the hypothetical question posed to the VE was inaccurate because it did not include her need to elevate her leg/knee several times a day.  This limitation is based solely on Plaintiff's discredited testimony, there is no medical evidence to support it.    Hypothetical questions need include only those  impairments and limitations that are borne out by the evidentiary record.  *Decker v. Chater*, 86 F.3d 953, 955 (10th Cir. 1996) *citing  Evans v. Chater,* 55 F.3d 530, 532 (10th Cir.1995).

### *Conclusion.*

For these reasons, Plaintiff's Motion to Reverse and Remand is **DENIED,** and the decision of the Commissioner denying Plaintiff's Applications for Disability Income Benefits and Supplemental Security Income is affirmed.

Richard L. Puglisi
United States Magistrate Judge
(Sitting by Designation)

11

ADDENDUM A
**SUMMARY OF PHYSICIAN-ASSESSED PHYSICAL RESTRICTIONS**

| Nordyke 7/16/01 Tr. 156 | Ritchie 5/9/02 Tr. 144 | Ritchie 7/1/02 Tr. 142 | Ritchie 8/20/02 Tr. 123 (form) | Yoder 1/27/03 (agency physician) (Tr. 165-169) | NM Orthopaedics (Ritchie) 6/30/03 Tr. 178 (form) |
|---|---|---|---|---|---|
| | Released to modified duty | Released to modified duty | | | No change in permanent restrictions |
| | 20 lb max | 40 lb max | 20 max 10 freq. | 20 lb occa 10 lb freq. | 20 lb occa. 10 lb freq. |
| | No repetitive lifting | | | | |
| will have difficulty w/ stairs | No climbing > 3' | climbing limitations unchanged | | May never climb ropes or scaffolds. Climbing of ladders limited to 3'. | No climbing |
| | no squatting | squatting limited to 25% of the time | | may squat occa. | No squatting |
| will have difficulty kneeling | no kneeling | | | may kneel occa. | No kneeling |
| | no walking or standing > 45 min/hr | walking-standing unchanged | can walk or stand to a sign. degrees | can walk or stand 6/8 hours/day, limited to 45 min/hr. | |
| | | | can push/pull with arm/leg controls | unlimited other than as shown | can use arm/leg controls to push/pull |
| | | | | can sit 6/8 hrs per day | |
| | | | | May stoop freq. | |
| | | | | May balance occa. | |
| | | | | May crouch occa. | |
| | | | | May crawl occa. | |
| | | | | Must avoid concen-trated exposure to extreme cold, wetness, vibration;  must avoid hazards | |

12